Philip J. BLAIR and William R.
Cross, Plaintiffs,

v.

Francis J. HEBL, Dane County
Clerk, Defendant.

No. 80–C–496.

United States District Court,
W. D. Wisconsin.

Sept. 30, 1980.

J. Timothy Gratz, Madison, Wis., for plaintiffs.

Cal Kornstedt, Asst. Dane County Corp. Counsel, John J. Glinski, Asst. Atty. Gen., Madison, Wis., for defendant.

CRABB, Chief Judge.

Although plaintiff Philip J. Blair received 1,433 votes in the primary election as a write–in candidate on the Republican slate for the office of Register of Deeds for Dane County, Wisconsin, defendant Francis J. Hebl refuses to place plaintiff Blair's name on the ballot for the November general election because plaintiff Blair failed to garner votes equal to or exceeding 5% of the 54,916 votes (2,746) cast in Dane County for the Republican gubernatorial candidate in the 1978 general election.

In this action plaintiff and one of his supporters challenge the constitutionality of Wis.Stats. § 8.16(2) which precludes write–in candidates from having their names on the general election ballot as the nominees of their parties if they do not receive primary votes equal to 5% of the total votes cast in their election district for their party's gubernatorial candidate at the last general election. Plaintiffs contend that the 5% requirement for write–in candidates works an invidious discrimination and that it burdens, impermissibly, their First Amendment rights to associate and to cast votes effectively. They seek declaratory and injunctive relief holding § 8.16(2) null and void and enjoining the defendant county clerk from refusing to place plaintiff Blair's name on the general election ballot as the Republican nominee for Register of Deeds.

The parties have stipulated to the material facts at issue in the case and have agreed among themselves that the stipulation would serve as a trial of the issues on the merits.

From the stipulation of the parties, I find the following facts.

## FACTS

Plaintiff Philip J. Blair is an adult resident of Madison, Wisconsin, who wishes to run as the Republican nominee for the office of Register of Deeds for Dane County; he meets the qualifications established by the Wisconsin Constitution and the Wisconsin statutes for election to that office.

Plaintiff William R. Cross is a duly registered voter in Dane County, Wisconsin, who desires to vote for plaintiff Blair for Dane County Register of Deeds in the November, 1980 election.

Defendant Francis J. Hebl is the Dane County Clerk. Under Wis.Stats. § 7.10, he is responsible for the preparation and printing of the official ballots for the November, 1980 election in Dane County.

Wis.Stats. § 8.16(1) and § 8.16(2) provide:

(1) The person who receives the greatest number of votes for an office on any party ballot at a primary shall be the party's candidate for the office, and that person's name shall so appear on the official ballot at the next election. . . .

(2) A person who receives only write–in votes shall not appear on the ballot as the candidate of a recognized political party for an office unless the person receives at least 5% of the vote cast in the jurisdiction or district for the party's gubernatorial candidate at the last general election or the number of votes equivalent to the minimum number of signatures required on nomination papers for that office under § 8.15(6), whichever is greater . . . .

Section 8.15(6)(e), Wis.Stats., requires a candidate for the office of Dane County Register of Deeds to submit nomination papers carrying the signatures of at least 500 qualified electors. In 1980, nomination papers had to be submitted no later than July 8. The primary election for the above–described office was held on September 9, 1980. Because no individual had filed nomination papers for the Republican nomination for that office, no name was printed on the Republican ballot for said office.

Plaintiff Blair campaigned as a write–in candidate for the Republican nomination for Register of Deeds. At the primary, plaintiff Blair received 1,433 write–in votes for the Republican nomination, including the vote of plaintiff Cross. No other candidate received any primary votes for the Republican nomination for Register of Deeds.

The Republican candidate for Governor in the November, 1978 general election received 54,916 votes in Dane County. Under § 8.16(2), plaintiff Blair was required to receive 5% of the vote cast in Dane County for the Republican gubernatorial candidate in 1978, or a total of 2,746 votes, in order to have his name placed on the ballot for the November general election.

Relying on the statutory requirement, defendant Hebl has refused to place the name of plaintiff Blair on the November general election ballot as the Republican nominee for Register of Deeds for Dane County. Without relief from this court, plaintiff Blair's name will not appear on the November ballot.

Under Wis.Stats. § 8.15(6)(e), a candidate for the office sought by plaintiff Blair is entitled ·to have his or her name on the September primary ballot upon submission of nomination papers carrying 500 signatures of qualified electors. Thus, plaintiff Blair received more votes in the primary than the number of signatures that would have been required on nomination papers to have his name placed on the September primary ballot. Under Wis.Stats. § 8.16(1), had plaintiff Blair submitted nomination papers as the Republican nominee for Register of Deeds, his name would have been placed on the November general election ballot regardless of how few votes he received at the September primary, so long as he received more votes than any other candidate for the Republican nomination for that office.

At the September 9, 1980, primary, Carol Mahnke received 9,794 votes for the Democratic nomination for the office of Register of Deeds for Dane County; Helen Slavens received 120 for the nomination of the Libertarian Party for the Office of Register of Deeds for Dane County; and plaintiff Blair received 1,433 votes. Plaintiff Blair received 12.63% of all the votes cast for all candidates for the office of Register of Deeds for Dane County.

Helen Slavens presented nomination papers for the Libertarian Party nomination for Dane County Register of Deeds, carrying a total of 547 signatures. Carol Mahnke submitted nomination papers for the Democratic party nomination for said office, carrying 861. Plaintiff Blair did not submit nomination papers.

There was no Libertarian Party candidate for governor in the 1978 general election. However, the Libertarian Party had a separate ballot at the September 1980 primary election under Wis.Stats. § 5.62(2).

The total number of votes cast in 1978 for the Democratic party nominee for Governor in Dane County was 56,631. The total number of votes cast for the Republican nominee in that election was 54,916.

The total number of votes cast in Milwaukee County in the 1978 election for the Democratic gubernatorial candidate was 168,854. For the Republican gubernatorial candidate, in that election in that county, the total vote was 145,363.

The Senate race drew the highest total of votes in the September, 1980 Republican primary in Dane County. The total number of votes cast for all the candidates seeking the Republican nomination for that office was 14,283.

On July 31, 1980, plaintiff Blair filed with the Dane County Clerk a campaign finance statement as a candidate for the office of Register of Deeds, pursuant to Wis.Stats. § 11.05. The statement identified him as a candidate for the Republican nomination for that office.

· Jurisdiction is present. 28 U.S.C. § 1343(3).

## OPINION

Plaintiffs' position is that § 8.16(2) places a substantial burden upon access to the

ballot which can be justified by the defendant only upon a showing both that the burden is required by a "compelling state interest" and that the state interest can not be effectuated in any less restrictive manner. In support of their position, plaintiffs cite *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), the first Supreme Court opinion to address the constitutionality of state restrictions upon the placement of candidates on the ballot.

In my opinion, plaintiffs' reliance upon *Williams* is misplaced. It is true that in *Williams*, the court found that the Ohio laws violated equal protection and applied the strict scrutiny standard of equal protection in its review of the election laws promulgated by the State of Ohio, declaring them to be unconstitutional as infringing impermissibly upon the rights to associate politically and to vote.[1] However, *Williams* was written under severe time pressures, as Chief Justice Warren noted in his dissent, 393 U.S., at 63, 89 S.Ct. at 27, and it provides little guidance for determining which burdens may be imposed by a state without running afoul of the United States Constitution.

Moreover, in its next opinion on the issue, the Supreme Court analyzed Georgia's ballot laws without any reference to a standard of review, impliedly rejecting a strict scrutiny analysis and concluding, apparently, that Georgia's legislative scheme worked no discrimination in ballot access for independents as compared to party candidates and imposed no burdens of any significance upon any candidate's access to the ballot. *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971).

In *Williams*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), the Court identified the fundamental interests affected as those of the right of voters to cast their vote effectively and of the right of individuals to associate for the advancement of political ideas. However, the Court did not define the contours or the content of the right to vote effectively in terms of access to the ballot. That omission has been the subject of criticism, *see, e. g.*, Tribe, *American Constitutional Law*, 779 (1978); Developments—Election Law, 88 Harv.L.Rev. 1111, 1134–1136 (1975).[2] As the critics have pointed out, "protecting a right of individual voters to vote for the candidate of their choice

---

1. The standard used was that of the so-called two-tier equal protection analysis. In applying this analysis, a court looks first, to whether there is an invidious discrimination in treatment between groups worked by the state and, if so, whether the discriminatory treatment affects a "fundamental interest," such as First Amendment rights. If it does not, then the court evaluates the difference in treatment by determining whether there is any rational relationship between the discrimination and an interest of the state. If, however, there is a fundamental interest at stake, then, to uphold the differential in treatment, the court must find both that the differential is required by a "compelling state interest" and that "no less restrictive means" could effectuate the state's interest.

Along with the application of the two different standards, the parties carry different burdens. Where there is no fundamental interest involved, the party challenging the statute must disprove the existence of any conceivable rational relationship of the treatment to a legitimate state interest; where there is such a fundamental interest, it is the statute's defender who must carry the burden of articulating and proving the compelling state interest and show-

ing that there is no less restrictive means of effectuating the state's interest.

2. In his concurring opinion in *Williams*, 393 U.S. 41–47, 89 S.Ct. 15–19, Justice Harlan confined his analysis to the one fundamental interest he found to be affected: the right of political association or, the right of third parties to have an opportunity "to put their candidates before the attention of the voters or whatever other body the State has designated as the one which is to choose Electors." *Id.* at 45, 89 S.Ct. at 18.

Additionally, Justice Harlan rejected the majority's characterization of *Williams* as an equal protection case, stating at pp. 42–43, 89 S.Ct. at pp. 16–17:

In deciding this case of first impression, I think it unnecessary to draw upon the Equal Protection Clause. I am by no means clear that equal protection doctrine, especially as it has been propounded in the recent state apportionment cases, *e. g., Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), may properly be applied to adjudicate disputes involving the mere procedure by which the President is selected, as that process is governed by profoundly different principles. [footnotes omitted]

would be a significant departure from prior voting rights cases, which dealt with restrictions on the franchise or dilution of the weight of an individual's vote." Developments, 88 Harv.L.Rev., 1134. Certainly, it is not clear whether protection of the right can be achieved simply by permitting write–in votes at every election or, whether, carried to its extreme, it might be viewed as requiring states to include on the ballot any candidate supported by at least one voter.

Succeeding opinions of the Supreme Court have not clarified the standard of review or the precise nature of the rights at stake. In *American Party v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), for example, the Court upheld a Texas statute denying a place on the ballot to any political party which had not secured 2% of the vote in the previous election or had failed to gather the signatures of registered voters numbering 10% of the votes cast in the same prior election. The Court found that the requirements were a substantial burden upon the plaintiffs' rights of association, but that they were justified by the state's compelling interests in preserving the integrity of the electoral process and in avoiding voter confusion.

In *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), the Court refrained from making a determination of the validity of California's requirements that an independent candidate (1) file a petition with signatures numbering 5% of the entire votes cast in the preceding general election in the area in which the candidate wishes to run; (2) gather all of the signatures in one 24–day period following the primary; and (3) include no signatures of persons who had voted in the primary. The Court found the record ·before it inadequate for deciding whether the ballot requirements were unconstitutionally severe, remanding the case for development of such facts as whether a "reasonably diligent" candidate could satisfy the requirements. *Id.*, at 742, 94 S.Ct. at 1285.

Finally, in its most recent opinion on the subject, the Supreme Court struck down an Illinois provision which required new parties and independent candidates for offices in the city of Chicago to gather more signatures than were required of new parties and independent candidates running for statewide offices, holding that such a requirement violated the Fourteenth Amendment's equal protection clause. *Illinois Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979).

In the absence of clear direction from the Court, certain principles can be derived from a comparison of the cases.

■ First, just as the totality of a legislative scheme may result in an impermissible burden upon the First Amendment rights of voting and association, as in *Williams*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, an otherwise burdensome law may pass muster when considered in the context of an entire scheme. This point might be stated otherwise: in determining whether a particular restriction upon ballot access is "substantial" enough to trigger equal protection analysis (by whatever standard), a court must evaluate the probable effect of the restriction upon the actual ability of candidates to get onto the ballot.

■ Second, equal protection analysis is not required of every distinction in a state's treatment of political parties and candidates. Indeed, what seems to be equal protection review in the cases might be seen more accurately as judicial concern with keeping open the opportunities for new or unpopular parties and independent candidates to gain access to the electoral forum.

Third, the Court has given explicit recognition to the states' interest in keeping their ballots to a manageable size and in preserving the integrity of the electoral process, permitting the states to condition access to the ballot upon a showing of a "significant, measurable quantum of community support," *American Party*, 415 U.S., at 782, 94 S.Ct. at 1307.

Evaluation of the validity of the Wisconsin election laws at issue herein begins with a review of the overall scheme embodied in Chapter Eight of the Wisconsin Statutes, by

which Wisconsin conditions access to the ballot for candidates.

Under § 8.15, persons wishing to run for state or county office or for the state or national legislature may qualify for the September primary election by circulating nomination papers no sooner than June 1 preceding the election and no later than the second Tuesday of July. For a county office in a county such as Dane County with a population of over 100,000, the candidate must obtain "not less than 500" signatures of qualified electors who have declared their intent to support the candidate and who live in the same county as that in which the candidate will serve if elected. Further, pursuant to § 8.15(1), "only those candidates for whom nomination papers containing the necessary signatures acquired within the allotted time and filed before the deadline shall have their names printed on the official September primary ballot." Under § 8.16(1), candidates who win a plurality of the votes for office on any party ballot at the primary become the party's candidate for that office, with their names placed on the general election ballot. The names of all independent candidates appear on the general election ballot regardless of the number of votes received at the primary.[3]

■ There are only two other ways in which a candidate for public office in Wisconsin can have his or her name placed on the general election ballot: (1) pursuant to § 8.16(2), by receiving a certain number of write–in votes in the primary for nomination as the candidate of a recognized politi-cal party; or (2) pursuant to § 8.35, by designation under special circumstances applicable only to vacancies caused by the death of a candidate after nomination.

It is difficult to imagine a scheme which would be more open and accessible to independent candidates and minority parties.[4] Plaintiffs do not contest the openness or nondiscrimination of the scheme as a whole. What they challenge is the discrepancy in treatment between those candidates who seek access to the general election ballot through write–in votes and those who proceed by nomination papers. Although plaintiffs contend that the discrepancy is violative of their rights to equal protection, their argument fails at the most basic level, because they have failed to show truly unequal treatment; that is, a difference in treatment between comparable groups. The fact is that both independent candidates and candidates of recognized political parties can gain access to the ballot by the simple expedient of filing nomination papers.

Unlike the laws struck down earlier this year by courts in Maryland, Maine, Ohio, Kentucky, and New Mexico,[5] Wisconsin's election laws impose no restrictive time limits or special filing requirements upon independent candidates seeking placement on the ballot which are not also imposed upon the candidates of recognized political parties.

■ Plaintiffs contend that the court should compare the treatment accorded them with that accorded candidates and

---

**3.** Presidential electors are chosen in a different manner. See, Wis.Stats. § 8.18 (1979).

**4.** The openness of the scheme may be attributable to the fact that many (perhaps most) of the elected officers in Wisconsin are chosen in nonpartisan elections. Candidates for such offices as justice of the state supreme court, state superintendent of public instruction, judge of the circuit court, county board supervisor, alderman, member of a local school board and mayor run as independent candidates, rather than as nominees of any political party. Furthermore, Wisconsin has a strong third–party tradition which may have influenced the development of the election laws.

**5.** *Anderson v. Morris,* 500 F.Supp. 1095 (D.Md. 1980); *Anderson v. Quinn,* 495 F.Supp. 730 (D.Me. 1980); *Anderson v. Celebreeze,* —— F.Supp. —— (S.D.Ohio 1980); *Anderson v. Mills,* 497 F.Supp. 283 (E.D.Ky. 1980); and *Anderson v. Hooper,* 499 F.Supp. 121 (D.N.M. 1980). In all of the cases, an independent presidential candidate challenged provisions of state law which required independent candidates to file certificates of candidacy or nominating papers substantially earlier than candidates of the recognized political parties. In each case, the earlier deadline was found to be an unconstitutional violation of equal protection.

their supporters who proceed by filing nomination papers; however, plaintiffs do not explain why such a comparison is warranted. It was the plaintiffs' own choice, not their status or anything done to them by the state, which resulted in their placement in what they now call a disfavored position. Having made that choice voluntarily, they have no basis on which to require the state to treat them in the same manner in which they would have been treated had they made the other choice. There is no requirement that the states homogenize all of their procedures, if each procedure, in and of itself, results in equal treatment among those who follow it.

Looking at plaintiffs' challenge from another perspective, I find that plaintiffs have failed to show a violation of their right to equal treatment because they have failed to show that the state has imposed any burden of any substance upon their access to the ballot. The state has made available to them, and all other candidates, a simple means of obtaining a place on the ballot. If they choose not to use that means, they can not attribute the unfavorable consequences of that choice to the state.[6]

In challenging the differential in treatment between write–in candidates for one party's nomination and write–in candidates for the nomination of another party for the same office and in the same election district; between write–in candidates for a party's nomination in one election district and write–in candidates for the same party's nomination for the same office in another election district, plaintiffs have compared similar groups as to which there is an arguable entitlement to equal treatment, but they have failed to show that the differential in treatment imposes a substantial burden upon any of the affected groups. The fact remains that any party candidate can get onto the ballot through filing nomination papers and winning the primary election.[7] So long as this alternative is available equally to all parties and interest groups, there is no ground for a finding that the state has violated any rights of equal protection by discriminating in its treatment among the parties or between independent candidates and those of the recognized political parties or that the state has burdened, impermissibly, the right of access to the ballot.

Whether each aspect of the system affects all candidates equally or operates in the least restrictive manner possible is not open to evaluation by the federal courts in the absence of a showing that the requirements impede the actual ability of candidates to gain placement on the ballot. Since there is no such showing in this case, there is no basis upon which to subject to equal protection analysis the separate, alternative features of the Wisconsin election law, such as those challenged in this case by plaintiffs.

### ORDER

IT IS ORDERED that plaintiffs' motion for a preliminary injunction is DENIED; that plaintiffs' claim for permanent injunctive and declaratory relief is DENIED; and that judgment is to be entered on the merits for defendant.

---

6. In support of their contention that the difference in treatment violates equal protection, plaintiffs cite a decision of the Supreme Court of Ohio invalidating a provision similar to Wisconsin's holding that the equal protection clause is violated by a requirement that a write–in candidate receive substantially more votes than the number of signatures he or she would have had to obtain in order to get onto the ballot. *State, ex rel. McIntyre v. Mininni,* 32 Ohio St.2d 17, 288 N.E.2d 816 (1972). Respectfully, I must disagree with the conclusion reached by the Ohio court, since I can not accept its initial premise that the difference in numerical requirements for write–in candidates and those nominated by petition requires equal protection analysis by the court where either route is equally available to independent and to party candidates.

7. In finding that the Wisconsin write–in procedure for party candidates is not unconstitutional, I do not make any finding as to the wisdom of the procedure. On its face, it seems somewhat peculiar, but there may be an explanation for it. The defendant has proffered none, and under the view I take of the plaintiffs' claim, is not required to.